**Donald H. WRIGHT, Appellant–Plaintiff,**

v.

**Bruce M. PENNAMPED and Lowe Gray Steele & Hoffman, Appellees–Defendants.**

No. 49A05–9405–CV–207.

Court of Appeals of Indiana.

April 30, 1996.

F. Jonathan Zusy, Ancel & Dunlap, Indianapolis, for appellant.

Richard A. Young, John B. Drummy, Eric D. Johnson, Kightlinger & Gray, Indianapolis, for appellees.

## OPINION ON REHEARING

SHARPNACK, Chief Judge.

The defendant-appellees, Bruce M. Pennamped and Lowe, Gray Steele & Hoffman (collectively "the Appellees"), have petitioned for rehearing of our decision reported in *Wright v. Pennamped*, 657 N.E.2d 1223 (Ind. Ct.App.1995). Although we deny the petition, we find that some clarification of our opinion would be useful.

■ At the outset, we note that the only information our opinion requires that a drafting attorney convey to the opposing party or counsel for that party is information about changes to a proposed contract which the opposing party is expected to sign. Such information is clearly not privileged and our opinion does nothing to disturb the attorney's obligation of confidentiality and fidelity to the client.

■ The Appellees assert that we misstated the record in the portion of our opinion which reads:

"Lastly, we address whether Pennamped delegated his duty to Krebs. Pennamped may have created an agency relationship where he was the principal and Krebs was his agent within this narrow scope of disclosing changes to Wright. Therefore, Pennamped may have discharged his duty by delegating it to Krebs. However, this raises a question of whether Pennamped actually instructed Krebs to inform Wright of the changes. The existence of an agency is a question of fact, therefore this issue should be decided by a trier of fact and not decided upon summary judgment. *Bryan*

*Mfg. Co. v. Harris* (1984), Ind.App. 459 N.E.2d 1199, 1204."

*Id.* at 1235.

■ In this portion of our opinion, we were identifying an issue, rather than stating the record. The existence of an agency relationship is generally an issue of fact. Whether the exchange between Pennamped and Ray Krebs created an agency relationship wherein Pennamped, as the principal, discharged his duty to inform Wright, and Krebs, as the agent, accepted that assignment is an issue of fact.

As stated in our opinion, there was no question in the record that Pennamped and Krebs spoke on the subject. *Id.* at 1227. The following excerpts from the record constitute the evidence of that discussion. First, Pennamped testified as follows:

"Q. Do you remember having any conversation with Mr. Krebs indicating to Mr. Krebs that Mr. Brown had approved the draft documents and had no changes to make?

＊　＊　＊　＊　＊　＊

A. ... I think what happened was after I got the fax I called Mr. Krebs and said I've talked to Mr. Brown and as I understand it he's not going to be available. Somebody needs to talk with the borrower about this....

＊　＊　＊　＊　＊　＊

Q. When you received the fax you made the changes?

A. I went ahead and talked to Krebs and said, 'Somebody needs to talk to the borrower.'

Q. And what did he say back to you?

A. He said, 'I'll take care of it.'

Q. Are those his exact words?

A. I don't—

Q. Are you paraphrasing?

A. I'm certainly paraphrasing. I wouldn't begin to try to quote what somebody told me in 1991.

Q. Do you know whether you had an understanding of what Krebs said? Was he going to call Brown or was he going to call the plaintiff directly?

A. I assumed he was going to call Mr. Wright since I didn't believe that Mr. Brown was available."

Record, pp. 1417–18, 1420–21. Later, Pennamped described again what was said during his conversation with Krebs:

"A. I got the fax. Whenever I got the fax after 10:50 I called Ray and said. 'I see your changes here.' And we talked about them. And I said, 'Somebody needs to talk to Mr. Wright. I'm not Mr. Wright's lawyer. Will you get a hold of him?'

'Yes, I will.' "

Record, p. 1426.

Second, Krebs testified as follows:

"A. Since I already testified that I don't recall the specific phone conversation, it, therefore, would be difficult for me to also recall whether I called him or he called me.

Q. What time of day did the conversation take place, if one took place?

A. This is also an assumption. I'm going to assume it took place the afternoon of the day before closing.

Q. And why do you make that assumption?

A. Because I think what in reality happened is Bruce would have talked to me on—In reality what happened, Bruce Pennamped would have, after Bruce had a chance to become, to actually realize the extent of the documentation changes that would have to be made, he would have instructed me to the fact that two people need to become aware that, of the changes, and make sure that we don't have any problems. And, that would be for me to call Don Wright and also to call Dick Brown and inform him of the changes.

Q. Mr. Pennamped asked you to call Mr. Brown?

A. That's an assumption, yes.

Q. You're just assuming that that happened?

A. Yes.

Q. Do you know whether that happened?

A. Well, I think there is a pretty strong reason to believe that, and the reason why—

Q. Mr. Krebs, do you know whether it happened?

A. I already told you that the answer is no, I do not recall the Dick Brown conversation.

Q. Do you recall whether or not Mr. Pennamped asked you to call Mr. Brown?

A. I already stated that I'm assuming that if the conversation took place the reason it did was I was asked by Mr. Pennamped to do so.

Q. Do you recall Mr. Pennamped asking you to do that?

A. No. No. No.

\* \* \* \* \* \*

Q. You discussed nothing else other than that generally?

A. Yes.

Q. Did you have any other conversation with him subsequent to that telephone conversation on August 5?

A. I'm not sure.

\* \* \* \* \* \*

Q. Prior to the closing, Mr. Krebs, did you ever fax to Mr. Wright or to Mr. Brown any document containing the changes which are contained in the last two exhibits that we've talked about?

A. I'm not sure.

Q. Is there a reason that you're not sure?

A. Yes. Because I, in going through my files and the things that I've looked at, I've seen no evidence that I did and, therefore, I'm not sure. That doesn't mean I could not have. It just means I'm not sure.

Q. Do you remember doing it?

A. No. That's why I said I'm not sure.

MR. BENNETT: There was a point of clarification that the witness wanted to make at this point in time.

\* \* \* \* \* \*

THE WITNESS: I really need the question to be read back. It was at the end there.

MR. BENNETT: I believe the question was concerning the content of the telephone conversation you had with Bruce Pennamped on August 5 and what would have been or what was discussed during that conversation. Do you recall the contents of that telephone conversation?

A. And the answer to that is not specifically, no, except for the fact that I would have went over these particular changes with Bruce and some time during that same conversation I'm certain that that would have been the time he would have informed me or instructed me to call Mr. Wright and Mr. Brown.

Q. Did he, did Mr. Pennamped instruct you to call Mr. Brown?

   \*     \*     \*     \*     \*     \*

A. I'm going to assume that he did.

   \*     \*     \*     \*     \*     \*

Q. During the telephone conversation you had with Mr. Pennamped on August 5 after you sent him the fax as you identified as document number 105—

A. Yes.

Q. Did he, during that telephone conversation, instruct you to call Mr. Wright?

A. Yes.

Q. What did he say to you?

   \*     \*     \*     \*     \*     \*

A. To call Mr. Wright, this is serious, and we need to contact the borrower and make him aware of the fact that the draft documents were in error and he needs to be aware of that since the closing is going to take place tomorrow, and does this mean we should reschedule the closing.

Q. These are all things that you remember he said to you?

A. Yes. Not verbatim, but in general, yes.

Q. Did he say the same thing with respect to the need to call Mr. Brown?

A. That part of the conversation I cannot recall.

Q. But you can recall this particular part of it?

A. Yes. Yes.

Q. Is there some reason that you can explain to me, why you can recall part of a conversation and not the other?

A. Well, because of Bruce discussing with me the seriousness of these changes and so forth and that the borrower needed to be notified.

The only reason that, as I previously stated, that I feel I also had a conversation with Brown, and I know of no other reason where I would have had, had I not been instructed to do so by Bruce or felt the obligation to do so on my own, would I have had a conversation with Dick Brown, and the purpose of the conversation would have been to notify him of the changes that I've testified to before.

Q. And you hadn't had the conversation up to that point with Mr. Brown; right?

   \*     \*     \*     \*     \*     \*

A. Not to my knowledge.

Q. Did Mr. Pennamped tell you why he didn't want to call Mr. Brown?

A. The answer to that, as I already testified, I'm not sure that Bruce specifically instructed me to do so. I assume he did, but I don't recall. I just said a few minutes ago, I don't recall the verbatim conversation with Bruce, and only based upon the indication of Dick Brown's phone logs show a conversation with me. That's the only way I know a conversation took place.

Q. Is that the only way that you believe that Bruce Pennamped instructed you to call Mr. Brown?

   \*     \*     \*     \*     \*     \*

A. Yes."

Record, pp. 1916–17, 1962–63, 1965–70.

We cannot, as a matter of law, conclude precisely what were the terms of the exchange between Pennamped and Krebs; nor can we, as a matter of law, conclude that the exchange created an agency relationship in which Pennamped, as principal, delegated to Krebs his duty to inform Wright of the changes and that Krebs accepted that delegation as agent.

We should note further that we did not explore the legal issue of whether Pennamped could discharge his duty to Wright by delegation alone. Finally, as we noted in our opinion, whether Krebs actually informed Wright of the changes is a contested factual issue.

A dissent has developed on rehearing. On the issue of actual fraud, the dissent concludes that Pennamped did not intend to deceive Wright because Pennamped instructed Krebs to inform Wright of the changes in the loan documents. The evidence noted by the dissent together with the trial court's conclusion of no intent was noted in our opinion. *Id.* at 1232. We also noted the evidence from which intent could be inferred and that remains in the record. *Id.* at 1232.

On the issue of constructive fraud, the dissent concludes that the absence of evidence that Wright would be precluded from seeking redress for his damages from SCI means that this is not a case so likely to result in injustice that the law will find a fraud despite the absence of fraudulent intent. We do not find that the validity of Wright's claim against Pennamped is dependent upon lack of a claim against what would be another tort feasor who might also have a liability to Wright.

With these observations, we deny the petition for rehearing. PETITION FOR REHEARING DENIED.

DARDEN, J., concurs.

BAKER, J., dissents with separate opinion.

BAKER, Judge, dissenting.

I respectfully dissent from the majority's decision to deny the Appellee's petition for rehearing. Although I concurred in the original opinion, the Appellees, through their petition for rehearing, have brought evidence to my attention which has caused me to reevaluate my position. In our original opinion, we found that the trial court erred in granting summary judgment on Wright's claim for fraud because there was evidence from which a jury might infer an intent to deceive on the part of Pennamped. *Wright v. Pennamped,* 657 N.E.2d 1223, 1232 (Ind.Ct.App.1995).

However, as the Appellees argue in their petition for rehearing, the uncontroverted evidence reveals that Pennamped instructed Krebs to inform Wright of the changes in the prepayment penalty clause, that he stressed the importance of such notification, and that Krebs agreed to do so. Thus, I believe that Pennamped's instruction to Krebs to inform Wright of the changes clearly demonstrates that Pennamped did not intend to deceive Wright. Therefore, although Pennamped may have been negligent in entrusting this duty to Krebs and failing to adequately supervise Krebs, these facts do not lead to an inference of fraud.

Moreover, upon further reflection, I would hold that the facts of this case are not amenable to the doctrine of constructive fraud in that I do not believe that the facts suggest a situation that is so likely to result in injustice that the law will find a fraud despite the absence of fraudulent intent. Here, there is no evidence that Wright would be precluded from seeking redress for his damages from SCI or that he could not recover those damages.

As a result, I would affirm the trial court's grant of summary judgment in favor of Pennamped.