Katherine HOESMAN and Gary
Hoesman, Appellants–
Plaintiffs,

v.

Daniel SHEFFLER and Constance
Pleasant Johnson, Appellees–
Defendants.

No. 77A01–0708–CV–385.

Court of Appeals of Indiana.

May 20, 2008.

Arnold H. Brames, Brames & Oldham, Terre Haute, IN, Attorney for Appellant.

Jeffry A. Lind, Fleschner, Stark, Tanoos & Newlin, Terre Haute, IN, Attorney for Appellee, Daniel Sheffler.

James O. McDonald, Joleen V. Klotz, Everett, Everett & McDonald, Terre Haute, IN, Attorney for Appellee, Constance Pleasant Johnson.

## OPINION

ROBB, Judge.

*Case Summary and Issues* [1]

This case involves an attempt by Katherine and Gary Hoesman to collect a judg-

---

1. Allan Hazelrigg, trustee, was originally a party to this action. Katherine was a minor when this matter commenced. However, she is no longer a minor, and Hazelrigg has filed a final report of the trust and has sought release from his duties. Katherine filed a Report of Real Parties in Interest, and this court issued an order on January 30, 2008, indicating that the appellants in this matter are Katherine and Gary. Throughout this opinion, we will refer to the Appellants as "the Hoesmans," even though at earlier

ment ordered in their favor and against Julia Sheffler, who converted money from a trust fund established for the benefit of the Hoesmans. The Hoesmans appeal the trial court's order granting summary judgment to Constance Johnson, Julia's mother, and denying the Hoesmans' motions to amend their complaint and to consolidate this case with another. On appeal, the Hoesmans raise four issues, which we consolidate and restate as:

1. Whether the trial court improperly granted summary judgment on the Hoesmans' fraudulent transfer claim;

2. Whether the trial court improperly granted summary judgment on the Hoesmans' claim that they held a statutory lien on property transferred to Constance and that this lien has priority over a security interest held by Constance; and

3. Whether the trial court abused its discretion in denying the Hoesmans' motions to amend their complaint and their motions to consolidate this suit with a prior related suit.

Daniel Sheffler, Julia's husband and a defendant in this suit, also raises the issue of whether the trial court's denials of the Hoesmans' motions for leave to amend their complaint and to consolidate are issues properly before this court.

We conclude the trial court's denial of the Hoesmans' motions to amend and to consolidate are not properly before this court, and therefore do not address the propriety of these decisions. Concluding that the trial court improperly granted summary judgment in favor of Constance on the Hoesmans' claims regarding fraudulent transfers and the priority of their lien, we reverse the trial court's grant of summary judgment and remand for further proceedings.

*Facts and Procedural History*

Ann Klapper died in 1992, leaving a trust (the "Klapper Trust"), to which Julia Sheffler was appointed trustee in 1997. While acting as trustee, Julia replaced Klapper's actual will with a will indicating the Klapper Trust continued until Katherine Hoesman, Klapper's granddaughter, turned thirty-five, instead of eighteen, as provided in the actual will. Additionally, Julia converted funds from the Klapper Trust for her own personal use. The Hoesmans discovered Julia's malfeasance in 2003, and on November 23, 2003, the Hoesmans filed a petition requesting relief, including Julia's removal as trustee. On January 29, 2004, the trial court issued an Agreed Judgment and Order requiring Julia to resign from her position as trustee and to prepare an accounting of the Klapper Trust's assets. Prior to this accounting, Julia obtained $300,000 from her parents, William and Constance Johnson, and made three deposits into the Klapper Trust, $100,000 on December 24, 2003, $90,000 on January 20, 2004, and $150,899.11 on March 3, 2004. Julia filed her accounting on March 3, but the trial court found that it was not a true and accurate accounting. In an effort to determine the extent of Julia's conversions, Alan Hazelrigg, the successor trustee, took Julia's deposition. However, Julia invoked the Fifth Amendment and refused to answer questions regarding her transactions as trustee. Subsequently, Julia was subpoenaed and called to testify at a court hearing, on October 4, 2004, but again invoked the Fifth Amendment.

On March 15, 2004, Julia and Daniel executed an "Installment Promissory

stages of the litigation and in the prior suit, the parties at the time were Hazelrigg and Gary Hoesman.

Note" (the "Note") under which they agreed to pay Constance, as trustee of the Constance Johnson Revocable Trust (the "Constance Trust"), and as successor trustee of the William F. Johnson Revocable Trust ("the William Trust"), $300,000, plus 6 percent interest, in annual installments of roughly $30,000, payable beginning December 31, 2004. On that same day, Daniel and Julia gave Julia's parents a security interest in several vehicles owned by Daniel and Julia, and executed a mortgage on their residence in favor of Julia's parents. On October 14, 2004, Julia transferred 65.33 shares of B & C Johnson Farms, Inc., a closely held, Subchapter S Corporation, to Constance. On January 5, 2005, Julia transferred her remaining eight shares to Constance.

The trial court finally determined that Julia stole at least $349,000 from the Klapper Trust. On November 15, 2005, the Sullivan Circuit Court issued a judgment against Julia and in favor of the Hoesmans in the amount of $288,144.95, under Cause No. 77C01–9202–ES–00015 ("Cause No. 00015"). This amount included double damages for the amount converted by Julia, attorney's fees, and additional damages for loss of investment funds and interest. The trial court also subtracted several amounts, including the roughly $340,000 that Julia had deposited in the Klapper Trust.

On April 12, 2005, the Hoesmans filed the instant suit against Julia and Daniel, alleging that Julia had damaged the Hoesmans through her malfeasance and misfeasance, and that Daniel either should have known of Julia's actions or participated in and realized the benefit of Julia's actions. On June 27, 2005, the Hoesmans filed a motion to consolidate the current action with Cause No. 00015. The trial court denied this motion on August 16, 2005. The Hoesmans subsequently moved, and were granted permission, to add Constance as a party in this case. This amended complaint alleged that Constance was the recipient of fraudulent transfers from Julia and Daniel, and requested a judgment that Daniel and Constance be named constructive trustees of any money or property transferred to them from Julia. On November 3, 2006, the Hoesmans filed a motion for leave to file a second amended complaint, in which they were attempting to join B & C Johnson Farms, Constance, as trustee of the Constance Trust, and Julia and Daniel's children. On January 29, 2007, the Hoesmans filed a motion for leave to file a third amended complaint, in which they were attempting to join Constance as trustee of the William Trust. Also on January 29, the Hoesmans again moved to consolidate the instant action with Cause No. 00015.

On November 16, 2006, Constance filed a motion to dismiss the amended complaint against her. This motion was later converted to a motion for summary judgment, to which the Hoesmans filed a response and designated evidence. Constance then filed a motion to strike the Hoesmans' designated evidence. On February 27, 2007, the Hoesmans filed a motion requesting that the trial court make findings of fact and conclusions of law in the event that it granted Constance's motion for summary judgment.

On May 3, 2007, the trial court issued an order granting Constance's motion for summary judgment and her motion to strike the Hoesmans' designated evidence [2] "inasmuch as the same lacks any specificity." Appellant's Appendix at 16. The trial court also denied the Hoesmans' mo-

---

2. It does not appear that the Hoesmans challenge the propriety of the trial court's grant of Constance's motion to strike the Hoesmans' designated evidence.

tions for leave to file second and third amended complaints and their motion to consolidate. The trial court did not issue any findings of fact or conclusions of law.

On June 1, 2007, the Hoesmans filed a motion requesting that the trial court certify its May 3 Order for interlocutory appeal and another motion requesting that the trial court declare its grant of summary judgment to be a final judgment. On August 14, 2007, the Hoesmans filed their notice of appeal of the May 3 Order despite the fact that the trial court had not ruled on their motions for certification or to declare a final judgment. On August 23, 2007, the Hoesmans filed a renewed motion to have the May 3 Order be declared a final judgment. On September 7, 2007, the trial court issued an order granting this motion, stating "that there is 'not just reason for delay' and this Court's Order and Summary Judgment dated May 3, 2007, granting Constance Johnson's Motion to Dismiss / Motion for Summary Judgment is now declared a 'final judgment' as to the issues of fact and law addressed in that Order and Summary Judgment." *Id.* at 17.

On November 29, 2007, Constance and Daniel filed a Joint Motion to Dismiss Appeal. On January 2, 2008, this court issued an order denying this motion. The Hoesmans now appeal.

*Discussion and Decision* [3]

### I. Summary Judgment

#### A. Standard of Review for Summary Judgment

Summary judgment is appropriate when the evidence shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Ind. Trial Rule 56(C). The trial court's grant of a motion for summary judgment comes to us cloaked with a presumption of validity. *Rodriguez v. Tech Credit Union Corp.*, 824 N.E.2d 442, 446 (Ind.Ct.App.2005). However, we review a trial court's grant of summary judgment de novo, construing all facts and making all reasonable inferences from the facts in favor of the non-moving party. *Progressive Ins. Co. v. Bullock*, 841 N.E.2d 238, 240 (Ind.Ct.App.2006), *trans. denied.* We may affirm the trial court's grant of summary judgment upon any basis that the record supports. *Rodriguez*, 824 N.E.2d at 446.

#### B. The Hoesmans' Claim Involving Fraudulent Transfers

 The purpose of a fraudulent transfer claim is "the removal of obstacles which prevent the enforcement of the judgment. . . . While the action may involve a conveyance said to be fraudulent, the recovery is not for the wrong or tort. It is not in damages." *Rose v. Mercantile Nat'l Bank of Hammond*, 868 N.E.2d 772, 776 (Ind.2007) (quoting *Beavans v. Groff*, 211 Ind. 85, 90, 5 N.E.2d 514, 516–17 (1937)). "If a fraudulent action is successful, '[t]he conveyances continue valid as between the grantor and grantee, and the only effect of the judgment is to subject the property to execution as though it were still in the name of the grantor.'" *Id.* (quoting *Beavans*, 211 Ind. at 90, 5 N.E.2d at 516).

##### 1. Absence of Julia from the Suit

 Initially, Constance argues that Julia's dismissal from this suit is fatal to the Hoesmans' fraudulent transfer claim. [4]

**3.** We held oral argument in this case on April 15, 2008, at Saint–Mary–of–the–Woods College. We thank the attorneys for their excellent oral advocacy and extend our gratitude to Saint–Mary–of–the–Woods for its hospitality.

**4.** The Hoesmans do not appear to challenge the trial court's dismissal of Julia.

She claims that Julia was the sole "debtor," as the Hoesmans have failed to demonstrate that either Constance or Daniel is a "debtor" for purposes of the Fraudulent Transfers Act. Constance points out that the *debtor* is a party in all the fraudulent transfer cases cited by the Hoesmans. However, nothing under Indiana Code chapter 32–18–2 indicates that a debtor is a mandatory party, and Indiana Code section 32–18–2–17 implicitly indicates that a debtor is not a necessary party. Under this section:

(a) In an action for relief against a transfer or an obligation under this chapter, a creditor, subject to the limitations in section 18 of this chapter, may obtain any of the following:

(1) Avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim.

(2) An attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with the procedure prescribed by IC 34–25–2–1 or any other applicable statute providing for attachment or other provisional remedy against debtors generally.

(3) Subject to applicable principles of equity and in accordance with applicable rules of civil procedure, any of the following:

(A) An injunction against further disposition *by the debtor or a transferee, or both,* of the asset transferred, its proceeds, or of other property.

(B) Appointment of a receiver to take charge of the asset transferred or of the property of the transferee.

(C) Any other relief the circumstances require.

(b) If a creditor has obtained a judgment on a claim against the debtor, the creditor, if the court orders, may levy execution on the asset transferred or its proceeds.

(Emphasis added.)

Although we agree that typically the debtor is a party to a suit involving fraudulent conveyances, we conclude that Julia's dismissal from the suit does not bar the Hoesmans from proceeding against Constance.

2. Merits of the Hoesmans' claim under the Fraudulent Transfers Act

The Hoesmans' claim under the Fraudulent Transfers Act primarily involves two statutes. Under Indiana Code section 32–18–2–14:

A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or

(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(B) intended to incur or believed or reasonably should have believed that the debtor would incur debts beyond the debtor's ability to pay as the debts became due.

Under Indiana Code section 32–18–2–18:

(a) A transfer or an obligation is not voidable under section 14(1) of this chapter against a person who took in good faith and for a reasonably equivalent

value or against any subsequent transferee or obligee.

(b) Except as otherwise provided in this chapter, to the extent a transfer is voidable in an action by a creditor under section 17(a)(1) of this chapter, the creditor may recover judgment for the value of the asset transferred, as adjusted under subsection (c), or the amount necessary to satisfy the creditor's claim, whichever is less. The judgment may be entered against:

(1) the first transferee of the asset or the person for whose benefit the transfer was made; or

(2) any subsequent transferee other than a good faith transferee who took for value or from any subsequent transferee.

(c) If the judgment under subsection (b) is based upon the value of the asset transferred, the judgment must be for an amount equal to the value of the asset at the time of the transfer, subject to adjustment as the equities may require.

(d) Notwithstanding voidability of a transfer or an obligation under this chapter, a good faith transferee or obligee is entitled, to the extent of the value given the debtor for the transfer or obligation, to:

(1) a lien on or a right to retain any interest in the asset transferred;

(2) enforcement of any obligation incurred; or

(3) a reduction in the amount of the liability on the judgment.

(e) A transfer is not voidable under section 14(2) or section 15 of this chapter if the transfer results from:

(1) termination of a lease upon default by the debtor when the termination is permitted by the lease and applicable law; or

(2) enforcement of a security interest in compliance with Article 9 of the Uniform Commercial Code.

The Hoesmans support their claim that they are entitled to avoid the transfer of stock and the Security Agreement under a fraudulent transfer theory by arguing that the transfer of $300,000 from Julia's parents to Julia was intended as a gift. If this transfer was indeed a gift, for which Julia and Daniel incurred no legal obligation, then the subsequent stock transfer and security agreement were not given for consideration. *See Brown v. Addington,* 114 Ind.App. 404, 408, 52 N.E.2d 640, 641 (1944) ("If a person has been benefited in the past by some act or forbearance for which he incurred no legal liability and 'afterwards, whether from good feeling or interested motives, he makes a promise to the person by whose act or forbearance he has benefited, and that promise is made on no other consideration than the past benefit, it is gratuitous and cannot be enforced; it is based on motive and not on consideration.'" (quoting 17 C.J.S., Contracts, p. 470, § 116)). However, if this transfer was not a gift, and was intended as a loan, then the stock and security agreement were given to Constance in exchange for value. *See* Ind.Code § 32–18–2–13(a) ("Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied."); *see also McLaughlin v. Ward,* 77 Ind. 383, 1881 WL 6672 at *2 (1881) ("A mortgage given solely for the purpose of securing an existing indebtedness rests on sufficient, if not a valuable, consideration.").

If the $300,000 transfer was a loan, Constance became a creditor of Daniel and Julia. In regard to payments to one creditor in favor of another, a "debtor may lawfully prefer one or more of his creditors by payment, mortgage, pledge, or deed in

exclusion of the others, and if the debt is a bona fide and honest one the said preference will not be set aside 'when such action is taken in good faith' and in the absence of a fraudulent intent." *Lewis v. Citizens' Bank of Covington,* 98 Ind.App. 655, 190 N.E. 453, 454 (1934); *see also Jones v. Gott,* 10 Ind. 240, 1858 WL 4005 at *3 (1858) ("A failing debtor may undoubtedly give a preference to one creditor or class of creditors, and a sale or assignment for such purpose is not treated as mala fide, but as merely doing what the law admits to be rightful."). Our supreme court has even specifically held that a debtor may prefer his parent over other debtors. *See McFadden v. Ross,* 126 Ind. 341, 26 N.E. 78, 79 (1890) ("The son had a right to prefer his father, and secure the debt due him. Whether his father was at that time demanding payment of it or not would make no difference. The son was owing him a bona fide debt, and he executed a note for the amount, and a mortgage on his goods, securing it...."). Thus, the Hoesmans' success under a fraudulent transfer theory depends on whether Julia's transfers to her parents were made: 1) for a bona fide and honest debt; 2) in good faith; and 3) free of fraudulent intent.

In arguing that this transfer was made with the intent to defraud the Hoesmans, the Hoesmans discount the ultimate disposition into the Trust of the money transferred from Julia's parents. Instead, the Hoesmans point out that the Security Agreement and stock transfer left Daniel and Julia with virtually no unencumbered property.[5] Although the Hoesmans argue forcefully that this transfer injured them, in order to succeed on the merits, they must prove fraudulent intent, *see McFadden,* 126 Ind. at 347, 26 N.E. at 79 (recognizing that in order to render a transfer preferring the debtor's father void, the other creditor would need "to show fraud, or knowledge of the fraud, on the part of the mortgagee"), or injury to the trust, *see Kennedy v. Lubro Co.,* 100 Ind.App. 491, 196 N.E. 366, 367 (1935) ("[A] creditor is not authorized to interfere with any disposition which his debtor may make of his property so long as he (the creditor) is not injured thereby." (quoting *Brumbaugh v. Richcreek,* 127 Ind. 240, 26 N.E. 664 (1891))).

The question of fraudulent intent is one of fact, *Lewis,* 98 Ind.App. at 659, 190 N.E. at 454 ("The fraudulent intent will not be inferred from the mere fact of preference. The question of fraudulent intent is one of fact."), and we recognize that this case comes to us on a grant of Constance's motion for summary judgment. "Fraudulent intent can be inferred from certain indicia called 'badges of fraud.'" *Lee's Ready Mix & Trucking, Inc. v. Creech,* 660 N.E.2d 1033, 1037 (Ind. Ct.App.1996). These badges include:

5. Constance claims that "[t]he undisputed evidence shows that the Hoesmans, as beneficiaries of the Klapper Trust, accepted the proceeds of the loan obtained by Julia and Daniel as partial repayment for Julia's conversion." Constance's Brief at 20. However, as the Hoesmans point out, this statement is not entirely accurate. It appears from the record that Julia obtained money from her parents and subsequently deposited money in the Trust in an attempt to avoid detection for her conversions. The Hoesmans do not appear to have had knowledge of the transfer or deposits until much later, after Julia had filed her fraudulent accounting of the Trust. Also, as the security agreement and stock transfers came well after the transfer of money, even if the Hoesmans knowingly accepted Julia's deposits in the Trust, they could not have accepted these deposits in exchange for the transfer of stock and execution of the security agreement, as these events had not yet occurred. Thus, Constance's argument on pages 25 through 29 of her brief is based on the faulty premise that the Hoesmans *elected* to have Julia deposit money in the Trust.

1. transfer of property by a debtor during the pendency of a suit;

2. transfer of property that renders the debtor insolvent or greatly reduces his estate;

3. a series of contemporaneous transactions which strip a debtor of all property available for execution;

4. secret or hurried transactions not in the usual mode of doing business;

5. any transaction conducted in a manner differing from customary methods;

6. a transaction whereby the debtor retains benefits over the transferred property;

7. little or no consideration in return for the transfer; and

8. a transfer of property between family members.

*Greenfield v. Arden Seven Penn Partners, L.P.,* 757 N.E.2d 699, 703 (Ind.Ct.App. 2001), *trans. denied.* The existence of several of these badges may warrant an inference of fraudulent intent, but no particular badge constitutes fraudulent intent per se. *Creech,* 660 N.E.2d at 1037. Instead, the trier of fact must examine all the facts, determine how many badges of fraud exist, and then determine if a pattern of fraudulent intent is apparent. *Id.* "There is no precise formula for drawing the line as to when there are sufficient indicia supporting a finding of fraud." *Id.* at 1039. Summary judgment can be proper in fraudulent transfers cases. *See Garza v. Lorch,* 705 N.E.2d 468, 473 (Ind.App.1998) (holding summary judgment proper where "the designated evidence in the record does not raise a question of material fact as to fraudulent intent. Specifically, there is no evidence that the transaction ... was out of the ordinary"). However, because of the fact-sensitive nature of a claim of fraudulent transfer, summary judgment should be granted cautiously in these cases. We have previously pointed out,

> The mere improbability of recovery does not justify summary judgment and the procedure is not intended to be a summary trial. The determination of intent based on a concurrence of the "badges of fraud" is a fact finding function arrived at through a thorough examination of the evidence; this examination may include weighing the evidence and determining the credibility of witnesses. We do not say that summary judgment would never be appropriate in such a case. However, before such a motion could be granted it would have to be clear that all the "badges of fraud" pointed to a finding of intent with no inference of a pure motive possible.

*Jones v. Cent. Nat'l Bank of St. Johns,* 547 N.E.2d 887, 890–91 (Ind.Ct.App.1989).[6]

Here, many of the badges of fraud are arguably present. *See* Appellant's Br. at 27–30 (pointing out that the transfers oc-

---

**6.** In *Gipperich v. State,* 658 N.E.2d 946, 950 (Ind.Ct.App.1995), *trans. denied,* we pointed out that *Jones* was decided under the previous statute governing fraudulent conveyances. The current statutory scheme applies only to those transactions made after June 30, 1994. Ind.Code § 32–18–2–1. However, Indiana's Fraudulent Transfers Act indicates that "[u]nless superseded by this chapter, the principles of law and equity, including the law merchant and the law relating to principal and agent, equitable subordination, estoppel, laches, fraud, misrepresentation, duress, coercion, mistake, insolvency, or other validating or invalidating cause, supplement this chapter." Ind.Code § 32–18–2–20. Also, cases cited since the adoption of the current Fraudulent Transfers Act make clear that the general approach to determining fraudulent intent remains substantially the same. *See Commercial Credit Counseling Servs., Inc. v. W.W. Grainger, Inc.,* 840 N.E.2d 843, 851 (Ind.Ct. App.2006); *Wright v. Pennamped,* 657 N.E.2d 1223, 1232 (Ind.Ct.App.1995), *clarified on denial of reh'g,* 664 N.E.2d 394.

curred after Julia's conversions were discovered, greatly reduced the Shefflers' estate, and involved family members, and arguing that the transactions were not made in the normal manner of doing business). However, this is not a typical fraudulent transfer case, as the debtor (Julia) had received (either by gift or by loan) assets that appear to be worth more than those dissipated,[7] and used the received assets to repay the Trust. On the other hand, Julia and Daniel's transfer of assets and grant of security came well after Julia's parents transferred funds to Julia. If the Hoesmans' theory that the transfer of funds was a gift is correct, the subsequent transfers and grant of security could be found fraudulent.[8]

In sum, we conclude that material questions of fact remain as to whether the transfers from Julia and Daniel to Constance were made in good faith and free of fraudulent intent. Therefore, summary judgment as to Constance on this issue was improper.[9]

## IV. Statutory Lien

Under Indiana Code section 30–4–3–22(c), when a trustee converts trust property, "if the fund or property cannot be traced or identified . . . the beneficiary is entitled to a lien against the trustee's individual property from the date and according to the value of the property at the time of the conversion." Therefore, under the statute's terms, the Hoesmans had a lien on Julia's property from the time of her conversions, well before the stock transfer or execution of the Security Agreement. "At common law priority of liens as a rule was fixed by the time the liens attached to the subject-matter, but, as to the statutory liens, a different rule as to priority may be fixed by the statute creating them." *Brownell Imp. Co. v. Nixon,* 48 Ind.App. 195, 92 N.E. 693, 694–95 (1910); cf. *In re Marriage of Hollingsworth,* 671 N.E.2d 165, 167 (Ind.Ct.App. 1996) (recognizing that a mechanic's lien, which "relates back to the time materials or labor are furnished . . . has priority over all liens subsequently created"). "The legislature has the undoubted power to specify circumstances under which a lien shall come into existence and to give such lien priority over all other except those already existing when the act was passed." *Phlipo's Estate v. Mercantile Nat'l Bank of Hammond,* 123 Ind.App. 332, 337, 111 N.E.2d 93, 96 (1953). Thus, the Hoesmans' statutory lien attached prior to the execution of the security agree-

---

7. It is worth noting that there seems to be some disagreement over the valuation of the stock. However, it does not appear that the Hoesmans argue that the stock and property granted as security are actually worth more than $300,000.

8. Constance puts forth an argument regarding unjust enrichment and states that "[t]he Hoesmans boldly request to be paid twice for Julia's wrongful conversions." Constance's Br. at 32. The Hoesmans are still owed some $300,000 based on Julia's malfeasance and misfeasance. We recognize that part of the trial court's award in Cause No. 00015 was double damages for Julia's conversions. Although, in a sense, the Hoesmans may eventually end up in a better position than they began, it seems that by authorizing damages in excess of actual damages for crimes, our legislature has made a determination that these damages are not "unjust." We therefore find Constance's arguments regarding unjust enrichment and double payment to be without merit.

9. We decline the Hoesmans' invitation to grant summary judgment in their favor on this issue. Not only do we find material questions of fact as to the intent of Julia and Daniel, as discussed, *infra*, we find that questions of fact remain as to whether Constance was a good faith purchaser for value. *See* Ind.Code § 32–18–2–18(b)(2) (indicating that a judgment may not be entered against a "good faith transferee who took for value").

ment.[10]

With regards to the stock transferred by Julia, "[a] valid lien created on real or personal property is enforceable against the property in the hands of any person with notice of the lien who subsequently acquires it." *State v. Mileff*, 520 N.E.2d 123, 128 (Ind.Ct.App.1988); *see also Aurora Nat'l Bank v. Black*, 129 Ind. 595, 29 N.E. 396, 398 (1891) ("All who acquired title to such property, or liens upon it, acquired such title or lien subject to the prior and superior liens of those to whom wages were due."); *Keim v. Myers*, 44 Ind.App. 299, 89 N.E. 373, 374 (1909) (where a creditor had a lien on a crop to secure the payment of rent, "until this rent was paid the appellant had no right to remove from the premises the corn and oats upon which the statute specifically created a lien in favor of the appellee thereon to secure said rent").

Constance also points out that the statute refers to the "trustee's individual property," and that some of the property involved in the security agreement and in the mortgage may be marital property or property belonging solely to Daniel. However, in this action, the Hoesmans are seeking to prove that Daniel knew of Julia's wrongful acts, and should therefore be declared a "debtor" as well.[11] Also, Constance makes no claim that the stock was marital property. Therefore, regardless of the ultimate determination as to Daniel's status, at the very least, Julia transferred to Constance some property on which the Hoesmans held a lien, rendering summary judgment in favor of Constance on this issue improper.

However, we are unable to grant the Hoesmans' request that we enter judgment in their favor, as a question of material fact remains as to whether Constance was a good faith transferee for value. We recognize that Indiana Code chapter 30–4–3 contains no explicit indication that such transferees have a defense against one holding a lien on a trustee's personal property. However, Indiana Code section 30–4–4–2(b) indicates

> A third person, to whom an interest in trust property is transferred by the

---

**10.** In her brief, Constance argues that "[t]he Hoesmans cite to no legal authority or order from the trial court imposing a 'super-priority' of their lien over any other creditors of Julia or Daniel." Constance's Br. at 24. However, the Hoesmans cite Indiana Code section 30–4–3–22(c), and point out that their lien attached at the time of Julia's conversions. Appellant's Br. at 37–38. They also state, "[t]he statute very specifically and clearly provides that a 'lien' attaches to each and every one of the Trustee's assets at the time and in the amount of each theft." *Id.* at 40.

**11.** Also, the statute indicates that "if the fund or property can be traced and identified, the beneficiary is entitled to restoration of the fund or property." Ind.Code § 30–4–3–22(c)(1); *see also Ross v. Thompson*, 128 Ind. App. 89, 98, 146 N.E.2d 259, 264 (1957) ("Whenever any property in its original state has been impressed with a trust, no subse-

quent change of its original form or condition can divest it of its trust character so long as it is capable of being identified, and the beneficiary thereof may pursue it and reclaim it, regardless of the form into which it has been changed, unless it has come into the possession of a bona fide purchaser without notice."). At various points, the Hoesmans point out that Julia used the converted funds to buy various things for herself and her family, including a tractor, payments of income taxes, and the payoffs for several loans taken out by Julia and Daniel. *See* Appellants' Br. at 42; *see also Maryland Cas. Co. v. Rottger*, 99 Ind.App. 485, 194 N.E. 365, 367 (1934) ("Where the fund consists of money, the identification of the specific coin is not required. The ascertainment of the fund into which it has entered and lodges is sufficient."). Therefore, it seems possible that the Trust could be entitled to this property under this subsection of the statute.

trustee in breach of trust, takes his interest free of the trust if he:

(1) takes for value and without notice of the breach of trust; and

(2) is not taking part in what he knows to be an illegal transaction.

Therefore, a bona fide purchaser without notice has a defense against one attempting to recover converted trust property. See *Catherwood v. Watson*, 65 Ind. 576, 1879 WL 5886 at *3 (1879); *Maryland Cas. Co. v. Rottger*, 99 Ind.App. 485, 194 N.E. 365, 367 (1934) ("A trust fund may be followed and recovered unless it has passed into the hands of a bona fide purchaser without notice."); *Rottger v. First-Merchants' Nat'l Bank of Lafayette*, 98 Ind.App. 139, 184 N.E. 267, 271–72 (1933).

Constance clearly had notice that Julia had acted improperly, and it therefore might be a reasonable inference that she had constructive notice of the lien. However, we are unwilling to conclude that the facts conclusively establish that Constance had such notice, and instead conclude that a question of material fact remains as to her knowledge of the lien. Therefore, summary judgment is inappropriate. *See Rebel v. Nat'l City Bank of Evansville*, 598 N.E.2d 1108, 1111 (Ind.Ct.App.1992).

V. **The Trial Court's Denial of the Hoesmans' Motions For Leave to Amend Their Complaint and Motion to Consolidate**

The Hoesmans also appeal the trial court's denials of their Motion for Leave to File Second Amended Complaint, Motion for Leave to File Third Amended Complaint, and Renewed Motion to Consolidate. Daniel argues that these issues are not properly before this court, as they are interlocutory and the Hoesmans failed to receive certification from the trial court and failed to file a motion with this court pursuant to Appellate Rule 14(B).

After the trial court issued its May 3 Order, on June 1, 2007, the Hoesmans filed an "Alternative Motion to Certify Court's Order of May 3, 2007 To Allow Interlocutory Appeal" (the "Motion for Certification"), appellant's app. at 951, and an "Alternative Motion to Declare Order of May 3, 2007 as Final Judgment as to Defendant Constance Pleasant Johnson" (the "Motion for Final Judgment"), *id.* at 956. On August 14, 2007, the Hoesmans filed their Notice of Appeal. On August 23, 2007, the Hoesmans filed a "Renewed Motion to Declare Order of May 3, 2007 As Final Judgment" (the "Renewed Motion for Final Judgment"). *Id.* at 13. The trial court held a hearing on the Renewed Motion for Final Judgment on September 6, 2007. At this hearing, the trial court indicated that it intended to make the order granting summary judgment for Constance a final appealable order, but that it would take the remaining issues under advisement. *See* Tr. of Sept. 6 at 13–14. On September 7, 2007, the trial court issued the following order:

The [Hoesmans], by counsel, having filed their Renewed Motion that this Court issue an Order, in writing, pursuant to Trial Rule 56(C) and/or 54(B) declaring that there is "not just reason for delay" and requesting that this Court determine that this Court's Order and Judgment of May 3, 2007 is a "final judgment" and the Court being duly advised in the premises, now grants said Motion.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that there is "not just reason for delay" and this Court's Order and Summary Judgment dated May 3, 2007, granting Constance Johnson's Motion to Dismiss / Motion for Summary Judgment is now declared a "final judgment" as to the issues of

fact and law addressed in that Order and Summary Judgment.

Appellant's App. at 17.

Under Trial Rule 54(B)

A judgment as to one or more but fewer than all of the claims or parties is final when the court in writing expressly determines that there is no just reason for delay, and in writing expressly directs entry of judgment, and an appeal may be taken upon this or other issues resolved by the judgment; but in other cases a judgment, decision or order as to less than all the claims and parties is not final.

The trial court's September 7 Order clearly indicates that its grant of summary judgment is a final appealable order. However, it does not purport to certify any issue for interlocutory appeal under Appellate Rule 14(B).

The Hoesmans argue that "the Trial Court clearly was disposed to grant final judgment with respect to [the motions for leave to file amended complaints and consolidation]." Appellants Reply Br. at 12. This argument fails for several reasons.

First, the trial court's Order indicates that it is responding to the Renewed Motion for Final Judgment. Although it appears that the Hoesmans failed to include this Renewed Motion in their appendix, the initial Motion for Final Judgment dealt solely with the order of summary judgment in favor of Constance. *See* Appellants' App. at 956. The Hoesmans addressed the other issues in their Motion for Certification. *See id.* at 951. As the trial court failed to rule on the Motion for Certification, this motion was deemed denied. *See* Appellate Rule 14(B)(1)(e). Nothing in the trial court's Final Judgment Order indicates that it was reconsidering the Hoesmans' Motion for Certification, and the language used indicates that

it intended to render its order of summary judgment, and that order only, a final judgment pursuant to Trial Rules 54 and 56.

Second, the trial court's Final Judgment Order makes no mention of the parties the Hoesmans sought to add pursuant to their second and third amended complaints. Under Trial Rule 54(B), a trial court must expressly enter judgment in favor of a party in order for the judgment to be deemed final. *See Georgos v. Jackson,* 790 N.E.2d 448, 452 (Ind.2003) ("A disposition of all claims requires more than the entry of a ruling on a motion without entry of judgment."); *Cincinnati Ins. Co. v. Davis,* 860 N.E.2d 915, 921 (Ind.Ct.App.2007) (recognizing that in order for a decision to be rendered a final judgment, the trial court must "in writing, expressly direct entry of judgment"); *Kreighbaum v. First Nat'l Bank & Trust,* 776 N.E.2d 413, 418 (Ind.Ct.App.2002) (holding that a judgment was not final as to parties against whom the trial court did not expressly enter judgment); *cf. First Fed. Sav. & Loan Ass'n of Gary v. Stone,* 467 N.E.2d 1226, 1231 (Ind.Ct.App.1984) ("A decision upon which a judgment has not actually been entered is not final."), *trans. denied; Hendrickson v. Amer. Fletcher Nat'l Bank & Trust Co.,* 158 Ind.App. 20, 22, 301 N.E.2d 530, 531 (1973) ("[A]n Order merely sustaining a motion to dismiss, without entering judgment thereon, is not an appealable matter.").

Finally, the trial court's orders denying the Hoesmans' motions to amend and to consolidate are not the type of orders contemplated under Trial Rule 54, as they do not "possess the requisite degree of finality [or] dispose of at least a single substantive claim." *Cardiology Assocs. of Nw. Ind., P.C. v. Collins,* 804 N.E.2d 151, 154 (Ind.Ct.App.2004). Instead, these orders seem to be of the type that "place[ ] the

parties' rights in abeyance pending ultimate determination by the trier of fact." *Id.* at 155; *see Stephens v. Irvin*, 730 N.E.2d 1271, 1277 (Ind.Ct.App.2000) (recognizing that although the practical effect of the trial court's grant of a motion to dismiss was in effect an end to the litigation, "procedurally speaking, the cause of action had not concluded, in that there was no final judgment"), *aff'd on reh'g*, 734 N.E.2d 1133, *trans. denied; Waldron v. Wilson*, 505 N.E.2d 858, 859–60 (Ind.Ct.App.1987) (holding that the denial of a motion to amend by adding a party is an interlocutory order and is not a final appealable judgment until the trial court enters judgment in favor of that party under Trial Rule 54(B)), *aff'd in relevant part*, 532 N.E.2d 1154 (Ind.1989). As such, the sole method by which the Hoesmans could appeal these orders is through an interlocutory appeal pursuant to Appellate Rule 14. *Cardiology Assocs.*, 804 N.E.2d at 155. The trial court failed to indicate that it was certifying any order under Appellate Rule 14. Further, the Hoesmans failed to file a motion with this court to accept jurisdiction. See App. Rule 14(B)(2)(A); *Anonymous Doctor A v. Sherrard*, 783 N.E.2d 296, 299 (Ind.Ct.App.2003) (dismissing appeal where the party failed to file a motion with this court to accept jurisdiction of an interlocutory appeal).

We distinguish this case from situations where a trial court certifies an order for interlocutory appeal and purports to certify only certain *issues* within that order. Under these circumstances, "[a]ny issues that were properly raised in the trial court in ruling on the trial court's ... order are available on interlocutory appeal." *Harbour v. Arelco, Inc.*, 678 N.E.2d 381, 386 (Ind.1997). For example, in *State v. Keller*, 845 N.E.2d 154, 160 (Ind.Ct.App.2006), a criminal defendant filed two motions to suppress. The trial court orally granted

one and denied the other. The State filed a motion to certify this order, and the trial court certified the order under Appellate Rule 14(B). The defendant filed a cross-appeal, arguing that the trial court improperly denied his motion to suppress. We disagreed with the State's argument that the defendant was not entitled to bring this cross-appeal, as "the trial court's determinations regarding both of [the defendant's] motions to suppress were certified by the trial court as one order." *Id.* at 160. We noted that if the trial court had issued separate orders on the two motions to suppress, and certified only the granted order, the issues related to the denied order would not be before this court. *Id.* However, because the trial court's certification order applied to both motions to suppress, we were required to address the defendant's cross-appeal. *Id.*

In this case, on the other hand, the trial court clearly addressed its grant of summary judgment separately from the motions for leave to amend the complaints and to consolidate. Although the trial court addressed these issues within the same order, it granted and denied these motions separately. *See* Appellant's App. at 16. In its Final Judgment Order, it also referred specifically to its grant of summary judgment in favor of Constance, and made no mention of its other orders. *See id.* at 17. Moreover, the trial court's grant of summary judgment and its denials of the Hoesmans' motions are not separate *issues* within a single order or judgment, but instead are separate orders.

As the trial court indicated that its order of summary judgment was a final appealable order, but failed to certify its orders on the Hoesmans' motions for leave to amend their complaints and to consolidate, we conclude that these issues are not properly before this court.

*Conclusion*

We conclude the trial court improperly granted summary judgment in favor of Constance, and remand for further proceedings. The trial court's denial of the Hoesmans' motions to consolidate and for leave to amend their complaint are not properly before this court, and we therefore decline to address the propriety of these orders.

Reversed in part and remanded.

RILEY, J., and KIRSCH, J., concur.